UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


United States of America          )
                                  )
                                  )
v.                                ) Case No. 5:22-cr-35-1
                                  )
                                  )
Daniel Ruiz                       )
                                  )
_____)


RE:  Sentencing Hearing

DATE:  May 17, 2023

LOCATION:  Rutland, Vermont

BEFORE:  Honorable Geoffrey W. Crawford
         Chief District Judge


**<u>APPEARANCES</u>**:

Jonathan Ophardt, AUSA
United States Attorney's Office
District of Vermont
PO Box 570
Burlington, VT 05402-0570

Mary M. Nerino, AFPD
Office of the Federal Public Defender
District of Vermont
95 Pine Street, Suite 150
Burlington, VT 05401

Evan K. Barquist, Esq.
Montroll, Oettinger & Barquist, PC
126 College Street, Suite 400
Burlington, VT 05401


TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
                 United States District Court Reporter
                     *verbatim@vermontel.net*

(The Court opened at 1:39 p.m.)

COURTROOM DEPUTY:  Your Honor, this is Case Number 22-cr-35, Defendant Number 1, United States of America versus Daniel Ruiz.  Present on behalf of the government is Assistant US Attorney Jonathan Ophardt.  Present with the defendant is Assistant Federal Public Defender Mary Nerino and Attorney Evan Barquist.  We are here for a sentencing.

THE COURT:  All right.  Afternoon.

ATTORNEY OPHARDT:  Good afternoon, Your Honor.

ATTORNEY NERINO:  Good afternoon, Your Honor.

THE COURT:  Give me one second to get organized here. I'll start by making sure that I've received everything.  I have the presentence report, of course, and I have the government's sentencing memorandum, and, Mr. Ruiz, I have your sentencing memorandum with your letter, which I thank you for -- I've read it all the way through -- and a letter from Tynaishaliz.  Did I say it right?

THE DEFENDANT:  "Tie-ny-sha-lee".

THE COURT:  Tynaishaliz?  Is she here?

ATTORNEY NERINO:  Or Naisha, Your Honor.  Yes, she is.

THE COURT:  Hi.  Thank you for writing such a nice letter about your dad.

ATTORNEY NERINO:  And, Your Honor, his mother, Flora Sanchez and Yajaira, Mr. Ruiz's sister, are also here.

THE COURT:  Great.  Thank you.  I have Yajaira's letter, and I think that's everything.  Anything late-filed that got past me from either side?

ATTORNEY OPHARDT:  No, Your Honor.

THE COURT:  Ms. Nerino?

ATTORNEY NERINO:  No, Your Honor.

THE COURT:  A couple of questions, Mr. Ruiz, to get started with you.  Have you had a chance to read the presentence report?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Did you also have an opportunity to go over it in private with your attorney, Ms. Nerino?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And was she able to answer any questions you had about the presentence report or the sentencing procedure?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Ms. Nerino, are there any objections to the report which remain for resolution by the Court?

ATTORNEY NERINO:  Nothing that's outstanding, Your Honor.

THE COURT:  Mr. Ophardt, anything from the government's side?

ATTORNEY OPHARDT:  No, Your Honor.

THE COURT:  At the end of the hearing, I'll put

formal findings on the record addressing the guidelines calculations and the broader statutory sentencing factors under the law that guide the court in reaching a federal sentencing decision, but I think it's time that I turn things over, Ms. Nerino, to you and to Mr. Ruiz. I'd be glad to hear from both of you.

ATTORNEY NERINO: Thank you, Your Honor. As your Honor knows, we filed a fairly lengthy sentencing memorandum in this case, and, for the most part, we're going to rest on the sentencing memorandum, but there are a few things that I did want to point out to the Court that are the main factors of what we're requesting here.

One is that we are asking the Court for a downward variance, as we noted, to the lower sentencing guidelines range of 135 months to 168 months based on Mr. Ruiz's criminal history category III instead of applying the career offender guidelines to his case. We supported that in our memorandum with some statistics that are through the United States Sentencing Commission, and we're asking the Court to impose a sentence on the very low end of that guideline. It's a sentence that's sufficient but no greater than necessary.

Your Honor, one of the things that we wanted to point out in response to the government's memorandum -- and I'm going to keep my comments very brief. Mr. Ruiz, in large part, wants to address the Court directly himself today, and he knows that

we've made arguments on his behalf already in our written submissions, but one of the things I did want address to the Court is in regards to the enhancement related to the weapon.

Obviously, Mr. Ruiz does not contest the fact that, under the relevant conduct provisions, it can be attributed to him. He didn't contest the fact that the enhancement would apply, but I do want to point out that Mr. Ruiz did not himself physically possess this weapon. He doesn't have a history of physically possessing weapons in relation to his drug offenses, and I do think that's a factor that the Court should be aware of and should look at when sentencing him. It does make him different from other individuals who are dealing, especially in regards to having weapons.

It does make it more dangerous, and he acknowledges that one of his associates did have the weapon in this particular set of circumstances, but this associate, Mr. Aviles, was sentenced as well in front of this court, and his sentence was 30 months of incarceration, and he was in a different circumstance to Mr. Ruiz, but he also had a criminal history category of III, and that's something that I do want to bring the Court's attention to, because I do think that, when the Court is considering the factors under 3553(a) looking at just punishment for the offense and a sentence of no greater than necessary a period of incarceration, I do think that's something that the Court should consider, especially in this

case.

We would be asking for a very low end of the lower guideline range, a downward variance, and, should the Court grant our motion for a downward variance and sentence him, we would also ask that the Court designate specific facilities for Mr. Ruiz. He would prefer FCI Devens or Danbury if he is going to be a low-risk designation. If he is going to be medium, he would ask for FCI Cumberland in Maryland. It is unclear at this point how he will be designated based on some outstanding factors, and the BOP, I've learned, is never certain on how they designate.

Should any of those fall through, he would prefer to be in a facility closest to his family up here in Massachusetts.

THE COURT: All right. So that's, Fort Devens is the first choice; Cumberland is the second?

ATTORNEY NERINO: Devens or Danbury would be the first choice if he's low.

THE COURT: Got it.

ATTORNEY NERINO: Cumberland would be the second choice if he is a medium designation, and then we are also asking this court impose his sentence today to be concurrent to whatever outcome remains to be seen in his pending state case in Massachusetts. So we would ask that the Court make that designation today.

THE COURT: All right. And he understands that I

don't have any control over what the Massachusetts state court judge decides to do?

ATTORNEY NERINO: He does, Your Honor, but he also understands that such a recommendation from this court sometimes does make it easier for the BOP's calculations at the end if it, for whatever reason, it's unclear to them how they should proceed.

THE COURT: Okay.

ATTORNEY NERINO: And then, Your Honor, with that I will turn to Mr. Ruiz, because he did have some factors he wanted to address to the Court after reading the government's memorandum about how this sentencing in this case is different than the last two cases that he was sentenced for for similar activity.

THE COURT: All right. And your recommendation is 135 months?

ATTORNEY NERINO: Yes, Your Honor.

THE COURT: Okay. Mr. Ruiz, I'll give you the floor. Would you like to introduce your family members?

THE DEFENDANT: Yes, Your Honor. My mother, my sister, my daughter in the back, and her best friend.

THE COURT: Nice. Thank you, and I appreciate all four of you coming. It is very helpful for everyone.

THE DEFENDANT: First and foremost, thank you for giving me time to speak up. I want to apologize to the

community of Vermont for my drug activity.  I know I hurt a lot of people in the community with my actions and decisions.  I hurt my family as well from putting them back into this position.

When I get released now for my last time, the difference would be, like, first and foremost, I need to stay away from my old friends that I couldn't, that live that lifestyle.  I can't, I can't associate with them no more.  I must identify my plans and my struggles and perform my plans.  I need to connect with people who do not do the things I used to do.  I need to ask probation for help and actually take the help that they could offer as helping me with a job, helping me with housing, you know, but also seek counseling, DHN.  Try to get enrolled in a night school or day, because I would like to become a youth worker and make sure that they don't make the same mistakes I've made in my life.

Don't wait last minute and ask for help.  You know, if, if things ain't going the way things that I expect, you know, I need to speak up, you know, and ask probation for help.  Don't wait last minute until I get back and go back to the wrong path again.

I'm getting old.  You know, I don't want to lose my mother while I'm incarcerated, because she is getting old in age as well.  I would like to build a better bond with my daughter.  It takes a strong man to walk away, and it takes a weak man to

give in.

Basically, what I'm trying to say is that I haven't been strong. You know, every time I got released, I gave up quickly. I thought things would be a lot faster. But, you know, I see my mom. She's, she's the definition of a strong person. She could be sick, and she's still going to work, no matter what, you know? She was always there for me. So I've got to take that knowledge and become a man and take responsibilities.

I need to connect with people who love me who I can handle the truth from. I want to be held accountable, adjust my progress, my path. Nobody is perfect. We all live our lives this way. Those who are successful are constantly going through that cycle for self improvement. When I get released and I get back into society, like I said, I can't expect things to happen the next day, you know? There's a progress.

I understand that failure is not fatal and failure is not final. My life doesn't end because I have a prison number. My life is not over because I might be labeled as a convict. I have to understand that there's people out there who are not going to believe me or give me the chance, but that's not everybody. Learn how to step out of my bubble. Mentally, my past, it doesn't define who I am, but it will qualify me for my future if I let it.

I need to learn how to dream again. All the dreams that I

stuffed down and buried so deeply under my pain and anger will eventually come alive again. Have faith and don't take nothing for granted. I need to set my -- I need to put my ideas into action and, in doing so, rebuild my self confidence, and it will help, and it will help me with my insecurity. I must recognize, renew, rebuild, and be invested in my life. I cannot get discouraged if it's taking longer than I thought. I must recognize all the mistakes that have led me to -- I must recognize all my mistakes that led me to where I'm at today.

So, basically, I'm working. I wake up the next day. I'm tired. I don't want to go to work. I'm going to call out. I can't keep on doing that, because that right there is creating a path for me to go back to my old ways of me going back to the street and selling drugs. I can't, I can't do that no more. I've seen my mom go to work her whole life. She hardly missed work. She could be sick. She can't walk. That woman will still go to work. I used to argue with her, Mom, you're sick. You can't go to work. She would still go.

Every day I must make a decision that I will fight for my success and my family's future. Quitting is no longer an option. I can't quit, because, if I quit, I'm going to be back in this position. I'm going to lose my family. I already lost my father, my grandmother to health issues. This who I got here, you know, and my brother who is home and my two uncles.

Like, they say my life's, like, my mom didn't raise me

this way, so my life shouldn't be this.  You know, my mom always taught me, you know, how to do the right path.  I was just a follower.  I was weak.  I wasn't strong.  And I can't quit.  She didn't quit.  I can't quit.  If I quit, I'm failing her, I'm failing my daughter.  I want to thank you for giving me the time to speak.  I apologize for my actions.

THE COURT:  All right, thank you.  Mr. Ophardt, how does the government see things?

ATTORNEY OPHARDT:  Your Honor, Mr. Ruiz was the manager and supervisor of a long-running drug trafficking organization that operated just up the road at the Highlander Motel.  The Highlander Motel wasn't the first place that Mr. Ruiz was dealing drugs in Vermont.  Per his own statements after his arrest, he started in the Barre and Montpelier area at a house that got raided so moved down to the Rutland area, bounced between a few different locations, and settled in at the Highlander.

As the Court is aware, the Highlander Motel is a place where folks have been staying through the pandemic and after on housing vouchers primarily, folks who really don't have another option as to where to go.  It's where the State's going to pay for their motel room.  Mr. Ruiz used that location to set up an operation where folks would go into one of the lower rooms, meet with either Mr. Kreth, who was charged in a separate case, or another person, and a runner would bring the drugs from the

room where Mr. Ruiz's crew was operating down to the lower rooms to do the deal.  Not the most sophisticated organization, but certainly one set up to insulate Mr. Ruiz from exposure to doing the hand-to-hand, the actual transaction.

And what's telling about this case, what really makes it set out, I can't remember another case where I've had a juvenile involved as a runner.  It's something we see in other districts.  It's set out in the guidelines as an enhancement and an aggravator, but it's one we don't run into often.  And this relationship between Mr. Ruiz and the juvenile was particularly problematic in that he's getting paid in both cash and marijuana for helping out, you know, a 17-year-old getting pot and smoking pot with Mr. Ruiz as payment for assisting in drug trafficking, which, as this court is well aware from a number of cases, can be quite dangerous.  Mr. Ruiz is aware it can be dangerous.  That's why his codefendant was armed. Mr. Ruiz knew he was armed, tolerated him being armed despite managing and supervising him in this drug trafficking organization.

The parties are in agreement that the career offender guideline is not something that this court typically applies. Certainly, Mr. Ruiz is a career offender.  He's a career offender due to two convictions, both nonviolent drug convictions, which is different than if they were both crimes of violence, but this drug trafficking organization is

different than a lot that this court sees, and the sentence needs to account for that.

As the Court is aware, the firearm enhancement can be applied when somebody doesn't even know a coconspirator has a gun. Knowledge isn't even required. It's basically strict liability that there was a gun involved. Here Mr. Ruiz knew, and he tolerated it despite his supervisory role. Juveniles, as I've already said, is a, is a different thing than we typically see.

I think it's important, too, to note for Mr. Ruiz's confession that he talks about how he wound up getting handed the phone by the "boss-boss", as he called him, the person who was running things before that person got incarcerated in approximately December of 2021. Mr. Ruiz's reaction to a higher up person getting incarcerated was to continue this line of activity. That wasn't a wakeup call for him. It was to just continue this path. Take the phone. You know what to do. And he did know what to do, because he's been doing it most of his adult life, and that's why we have such a high guideline calculation under the career offender guideline.

This cycle of drug trafficking culture, this passing it down to younger folks is particularly concerning in this case. Mr. Caquias Aviles got the sentence he did because he's a substantially younger man, substantially fewer run-ins with the law. Mr. Jordan Almore, who Mr. Ruiz claimed in his

post-arrest is higher ranking than him -- the government doesn't agree to that characterization -- he's a substantially younger man.  He had no criminal history.

Mr. Ruiz is the senior member of this organization, and he's passing on how to run the drug game to others, which is set out in the PSR with some of the examples of text messages in Paragraph 28.  The reports, the setting up of deals from Mr. Ruiz to Mr. Almore, "So-and-so is on her way to 24 for 3 buns.  So-and-so is on her way for half packs.  She got 250", and Mr. Almore reporting back how business has been.  This type of hierarchical relationship, this type of mentoring of other drug dealers is a substantial aggravator in this case.

His knowledge of the firearm, his use of the juvenile, the manner in which he compensated the juvenile, and his role with these younger individuals warrants a sentence above what the defense is requesting.  The government understands career offender is not an acceptable sentence for this court to impose.  It concurs a downward variance is appropriate.  The request is a sentence of 144 months to be followed by a 3-year term of supervised release.  Thank you, Your Honor.

THE COURT:  Thank you both.  The next thing for me to do is to read the guidelines into the record so they have a permanent home in the record of our sentencing, and I'll do that.  Then I'll speak more broadly about the sentence.

Pursuant to the decisions of the Supreme Court in the

*United States v. Booker* and *Gall v. United States* and the Second Circuit Court of Appeals' decision in *United States v. Crosby,* in determining the following sentence, the court has considered the United States Sentencing Guidelines applicable in this case, including all departure authority contained in the Guidelines policy statements, as well as all of the factors enumerated in 18 U.S.C. Section 3553(a).

The court finds as follows:

1.  The offense of Conspiracy to Distribute Heroin, Fentanyl, and Cocaine Base, in violation of 21 U.S.C. Sections 846, 841(a), 841(b)(1)(C), and 846 occurred in or about March of 2022.

2.  The guideline for this offense is found in Section 2D1.1 of the Guidelines Manual, the November 2021 edition.  The defendant meets the criteria for a career offender.  However, the offense level for a career offender only applies when it is greater than the offense level otherwise applicable.  The offense level under Guideline Section 2D1.1 after the applicable enhancements is 33.  Therefore, because the offense level under Section 4B1.1(b) is less, the offense level under Section 2D1.1 remains controlling.

3.  The offense involved at least 100 kilograms but less than 400 kilograms of cocaine base, resulting in a base offense level of 24.

4.  Specific offense characteristics apply.

a.  A dangerous weapon, a firearm, was possessed. Therefore, two levels are added.

b.  The defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance, resulting in a two-level increase under Guideline Section 2D1.1(b)(12).

c.  The defendant is receiving an aggravating role adjustment, and he knowingly involved an individual under the age of 18 in the offense.  Consequently, two levels are added. The adjusted offense level is 30.

5.  The defendant's role is that of a manager or supervisor.  The criminal activity involved five or more participants.  Therefore, three levels are added.  The adjusted offense level is 33.

6.  The defendant demonstrated an acceptance of responsibility for his offense.  Therefore, his offense level is reduced by two levels, pursuant to Guideline Section 3E1.1. The total offense level is 31.

Would there be a third acceptance of responsibility reduction, or why is it not here?

ATTORNEY OPHARDT:  Your Honor, the Court will recall Mr. Ruiz pled guilty after we were very close to trial.

THE COURT:  Yes.

ATTORNEY OPHARDT:  So the government did not move for the third point due to the timing.

THE COURT:  Got it.  Thank you.  I appreciate that.

ATTORNEY OPHARDT:  Thank you.

THE COURT:  The defendant has a total criminal history category -- the defendant has a total criminal history score of 6, resulting in a criminal history category of III. However, a career offender's criminal history category under 4B1.1 shall be category VI.  The guideline range of imprisonment for an offense level of 31 and a criminal history category of III is 188 to 235 months.  That would be using the category VI criminal history.  The guideline range for a term of supervised release is three years.  Since the applicable guideline range is in Zone D of the sentencing table, the defendant is ineligible for probation.

I'll turn from these to the broader statutory sentencing factors that are set out at 18 U.S.C. Section 3553.  I've considered these factors in seeking to reach a sentencing decision which is sufficient, but not greater than necessary, to comply with the purposes of the sentence.  I've considered the need for the sentence to reflect the seriousness of the crime, to promote respect for the law, and to provide just punishment.  The sentence should also deter criminal conduct, protect the public from future crime by the defendant, and promote rehabilitation.

Let me talk about some of these factors in particular. The nature and circumstances of the offense, Mr. Ruiz, I know

from reading your letter that you recognize, as I do, the damage that drug dealing does in our communities. You spoke about it in your letter. You've been in this life for a number of years, and you've seen it firsthand. I'm not here to give you a lecture about it, especially in front of your family, but you know that it's a very serious offense, causes a great deal of harm, separates children from their parents, results in overdose deaths, causes people to lose their way in life, to lose their homes, their livelihood, their marriages. It's a very destructive behavior, and so it's a serious offense.

History and characteristics of the defendant, I'll put my cards on the table. I went through and made a note of the times when you appeared before judges in a setting very much like this to deal with the offense of drug dealing. At age 20 you received a 90-month federal sentence. There was a 6-month tacked on for violation of supervised release. There was, at age 26, a state heroin conviction, a 2.5- to 3-year term. I, those, those were the, were the principal ones, and I read the comments in 2008 before Judge Ponsor. Let me make sure that I'm getting it right.

The point I'm trying to make, again, without any intent to embarrass you in front of your family, is I'm hardly the first person to talk to you about these things, and this is at least the third opportunity for you to make that change that I know you want to make. But each time that you reoffend the

sentences tend to go up; they don't go down, and that's, I think, reflected in a very candid way in the recommendations of both sides for either 135 or 144 months. There's not much daylight between the parties' positions. So history and characteristics of the defendant has been persistent, persistent involvement in drug dealing.

The need to avoid unwarranted sentence disparities among similarly situated defendants: The Court has tried to be consistent in sentencing people at the high end of the drug distribution organization to longer sentences, and this one is no exception. I also have in mind the need for the sentence to promote public safety and protect the public from future crime. The long incarcerative sentence, in excess of ten years proposed by both sides, I think, achieves that, those goals.

So with all of that on the table, I'll impose the court's sentence if you'll stand up.

It is the sentence of the court that the defendant is committed to the custody of the Federal Bureau of Prisons for a term of 140 months, to be followed by a 3-year term of supervised release. I'll, the conditions of supervised release are as follows. I'll read them aloud:

a. You must not commit another federal, state, or local crime.

b. You must not unlawfully possess a controlled substance.

c.  You must refrain from any unlawful use of a controlled substance.  You must submit to one drug test within 15 days of release from imprisonment or placement on probation and at least two periodic drug tests thereafter as determined by the court.

d.  You must cooperate in the collection of DNA as directed by the probation officer.

e.  You must comply with the standard conditions of supervision adopted by this court.  These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

f.  You must submit your person, property, house, residence, vehicle, papers, computers, (as defined in 18 U.S.C. Section 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer.  Failure to submit to a search may be grounds for revocation of release.  You must warn any other occupants that the premises may be subject to searches pursuant to this condition.  An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence

of this violation.  Any search must be conducted at a reasonable time and in a reasonable manner.

g.  You must participate in substance abuse treatment, which may include a substance abuse assessment with a licensed substance abuse provider, and follow any program treatment recommendations.  This program may include testing to determine whether you have reverted to the use of drugs or alcohol.  You shall contribute to the cost of services rendered based on ability to pay or the availability of third-party payment.  You must refrain from the use of alcohol and other intoxicants during and after treatment.

The guideline fine range is from $30,000 to $1 million.  The defendant has demonstrated no ability to pay a fine.  Therefore, all fines are waived.  A special assessment of $100 is imposed, due immediately.

The sentence is a variance downwards from the career offender range to the level, the level III range, which you would have been in except for the career offender counting of the prior convictions.  I'm satisfied that that variance downwards more accurately reflects the criminal history, which is serious but not violent in nature and driven in part by your own drug use and substance abuse troubles.

The, I'll include the recommendation from the Court that the sentence be treated as concurrent with any sentence handed down in the pending cases in state court in Massachusetts.  I

don't have authority to require that.  That would be for the judge in Massachusetts to decide what he or she feels is appropriate, but a concurrent sentence would be entirely acceptable to me and, and within the kind of my expectation of what would be an appropriate outcome.

I'll recommend Fort Devens or Danbury FCI if you qualify, Cumberland as a backup if your security level is higher, and, in any event, that the Bureau of Prisons consider the closest, the facility closest to Massachusetts.  Did you want the RDAP recommendation?

ATTORNEY NERINO:  Your Honor, we would -- the Court's indulgence for one moment.  Your Honor, he would like that recommendation, please.

THE COURT:  Sure.  And I'll recommend that you be considered for participation in the RDAP in-house, in-jail drug substance abuse treatment program.  Did you do it before?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Yeah.  So it, it doesn't hurt to do it twice.  Again, that's the Bureau of Prisons' businesses, but it would have some benefits to you personally, and it, it might have other benefits as well.

I've got a note here that in reading -- yes.  When I read the statement of reasons on Paragraph 3, it should have read, "The offense involved at least 100 kilograms but less than 400 kilograms of converted drug weight", not cocaine base.  So I'll

make that correction for the record. I appreciate our deputy's close eye on the, on what's said.

I think that's all. You have appeal rights. They're important. I'll read them aloud:

Both the defendant and the government may have the right to appeal this sentence as set forth in Title 18, U.S. Code Section 3742. If the defendant is unable to pay the cost of an appeal, he has the right to apply for leave to appeal in forma pauperis and request the court to appoint counsel for him. If the defendant so requests, the clerk of the court shall prepare and file forthwith a notice of appeal on behalf of the defendant. Notice of appeal by the defendant must be filed within 14 days of the date judgment is entered on the docket, pursuant to Rule 4(b) of the Federal Rules of Appellate Procedure.

Mr. Ruiz, that brings the formal part of our sentencing to a close. I just want to say really much as Judge Ponsor said ten years ago. He's a more colorful speaker than I am. I read his remarks with interest. We all need you back. Your family needs you back. Your children need you back. But we can't have you back until you're in a different direction and frame of mind. I know in the moment you intend well, but in the next moment you fall in with your old friends and your old ways, and then it brings you back into court for another long stretch, and I hope very much that this is the last one.

When you're released and when you complete your term of incarceration, likely, your sentence, your supervision will be transferred to Massachusetts where your family is and where you make your home.  So it's unlikely that you and I will see each other again, but I'd be glad to get a letter from you.  I'll share it with the government and share it with the defense, with Ms. Nerino, about how you're doing and that you made it safely home.  But the, the people behind you need you back in a different way, and I know previous judges have felt acutely, and I do, too, your family's loss.  Okay?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Count Two?

ATTORNEY OPHARDT:  Yes, Your Honor.  The government would move to dismiss the remaining count of the indictment.

THE COURT:  Thank you.  Granted.  Anything further, Ms. Nerino, from your side?

ATTORNEY NERINO:  Your Honor, just one point of clarification.

THE COURT:  Yes.

ATTORNEY NERINO:  I was trying to make sure that I put a check mark by everything Your Honor was saying.  Did Your Honor note credit for time served?

THE COURT:  Yeah, I think it's -- yes, absolutely.  It would be hard to take it away from him.

ATTORNEY NERINO:  Yes, Your Honor.  I believe so as

well, but I usually listen for it, and I wasn't sure I heard that.  Thank you for clarifying.

THE COURT:  Yes.  No.  The time you spent up until now awaiting trial and sentencing in this case will certainly be applied against your term of incarceration.

ATTORNEY NERINO:  Thank you, Your Honor.  Nothing further from the defense.

THE COURT:  All right. From the government?

ATTORNEY OPHARDT:  No, Your Honor.  Thank you.

THE COURT:  Thank you both for your help.  I appreciate it.  Your memos, I thought, were very thoughtful from both sides.  Thank you.

(Whereupon at 2:21 p.m. the hearing was adjourned.)

C E R T I F I C A T E

I, Sunnie Donath, RMR, Official Court Reporter for the United States District Court, District of Vermont, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes of the hearing taken before me in the above-titled matter on May 17, 2023 to the best of my skill and ability.

I further certify that I am not related to any of the parties thereto or their counsel, and I am in no way interested in the outcome of said cause.

*Sunnie Donath, RMR*
---------------------------------
Sunnie Donath, RMR